Merchants National Bank of Savannah *v.* Guilmartin.

The court committed no substantial error in admitting evidence, or in charging the jury, or in refusing to charge as requested. The evidence warranted the verdict, and there was no error in denying a new trial.

December 18, 1893.

Complaint.  Before Judge MacDonell.  City court of Savannah.  May term, 1893.

Erwin, duBignon & Chisholm, for plaintiff in error. C. N. West and J. R. Saussy, *contra.*

Simmons, Justice.

Guilmartin sued the Merchants National Bank, alleging that it was indebted to him $20,000, in that on March 7th, 1887, he had intrusted to and bailed as a special deposit in the charge and custody of the defendant, which was then engaged in the business of banking,

certain bonds for which the bank gave him receipts of that date, specifying that the securities therein described were "to be held subject to his order," and signed by the cashier of the bank (Gadsden), as such. On April 18th, 1891, at the defendant's banking house, he demanded the .bonds, but it failed and refused to deliver them, etc. The defendant pleaded that it had exercised all due care in keeping the bonds, but, before the demand for them was made, they were, without fault on its part, feloniously taken and stolen. The plaintiff obtained a verdict, and the defendant's motion for a new trial being overruled, it excepted and brought the case to this court, and the decision of the court below was reversed. (88 *Ga.* 797.) Upon the second trial of the case, the plaintiff again obtained a verdict, and the defendant made a motion for a new trial, which was overruled, and it excepted.

The evidence warranted the verdict, and no error requiring a new trial was committed by the court below in admitting evidence, or in charging the jury, or in refusing to charge as requested. It appears that the bank received the bonds sued for from the plaintiff as a gratuitous special deposit, and that its cashier, Gadsden, fraudulently took them from the bank and converted them to his own use; and the main question in the case was, whether or not the defendant exercised due diligence in retaining Gadsden as cashier and custodian of this property, under the circumstances shown by the evidence. It appears from the evidence that during the time the bonds were in the bank and in Gadsden's keeping as cashier, he was engaged, on his own account, in numerous and large speculations in stocks and bonds, on "margins"; and there was evidence that the president of the bank knew something of this. A broker with whom Gadsden dealt in these speculations testified that their dealings extended continuously through a

period of about two years preceding the conversion of
the bonds, and that the transactions between them were
conducted by interviews at the cashier's desk in the
bank, where they were frequently seen by the president
of the bank; that the president knew Gadsden was
speculating, for he often approached the witness during
these visits to the bank, and inquired if Gadsden was
making much money; that he stated to the witness that
he knew the witness was "doing business with folks
there at the bank"; and on one occasion, in the hearing
of the witness, and just after he and Gadsden had been
consulting about certain New York and New England
stocks, of which Gadsden then had two hundred shares
and which were rapidly fluctuating in value, told Gads-
den to buy him a hundred, and Gadsden thereupon
directed the witness to buy another hundred in his
(Gadsden's) name. The evidence on this subject was
not met by any contradiction or explanation on the part
of the defendant. The burden was upon the defendant
to show that it exercised proper diligence (Code, §2064);
and this burden was not removed, nor the burden of
showing the contrary cast upon the plaintiff, as was con-
tended on the part of the defendant, by showing that
Gadsden was intrusted with the property of the bank
of a similar nature, or that the officers of the bank gave
the same degree of supervision to the plaintiff's prop-
erty as to that of the bank. The law prescribes a cer-
tain standard of care as to bailments of this kind, and
that standard is not the conduct of the bailee in the
particular case with reference to his own property, but
the general conduct of a class—the conduct of men of
common sense, as a class, in the care of their own property
erty (Code, §2063); and there is no presumption that the
conduct of the bailee in the particular case conformed
to that standard. Section 2064 of the code, above cited,
declares that "in all cases of bailments after proof of

loss, the burden of proof is on the bailee to show proper diligence"; and such diligence is not established by showing merely that the officers of the bank treated the bailor's property in the same manner in which they treated the property of the bank. The conduct of the bailee as to his own property may fall short of the standard of diligence prescribed as to property intrusted to his care; and nothing less than actual proof of such diligence will satisfy the requirement of the statute. Under the evidence before them, the jury were authorized to find, as they did, that the defendant failed to show such diligence.

The law applicable to the case is so clearly stated in the charge of the court below, that we give in substance the principal portions of the charge, adopting the same as a part of this opinion: All bailees are required to exercise care and diligence in protecting and keeping safely the thing bailed. Different degrees of diligence are required according to the nature of the bailment. It being conceded that the bank, in accepting the plaintiff's bonds on special deposit, did so gratuitously and without any stipulation or agreement that it was to receive or have the right to demand any reward or compensation for so doing, in its duty of protecting and keeping safely the bonds so deposited it was bound to exercise only slight care and diligence, "that care which every man of common sense, how inattentive soever he may be, takes of his own property." It would be liable only in the event it was guilty of a want of that degree of care and diligence which is termed "gross negligence," and the bonds were lost because of that gross negligence. If, after this deposit was made with the bank, the plaintiff by his agent demanded the return of his bonds by the bank, and the bank failed to return them, this would constitute sufficient proof of loss, and put upon the bank the burden of showing that its fail-

ure or inability to return them was not due to any failure on its part to exercise due diligence—that degree of care which the law requres of it in keeping and protecting bonds so deposited, namely, slight care. The burden would not then be on the plaintiff to show that the bank was grossly negligent; the burden would be on the bank to show that it had exercised slight diligence in the matter. If the bank showed it had done so, it would be acquitted of all further accountability for the bonds; if it failed to show this, it would be liable. If, while the bonds were in the custody of the bank on special deposit, they were stolen by its cashier, Gadsden, the first question would then be, was Gadsden, at the time he was originally selected and employed as its cashier, a fit, proper and trustworthy person for such position, so far as the bank, in the exercise of slight diligence, could ascertain and determine? If he was, the next inquiry would be, did the bank, at any time before he stole the bonds, know or have cause. to suspect that he had become or was likely to become untrustworthy? The bank was bound to exercise slight diligence all along during the time of his employment. If it knew he had become untrustworthy, or if in the exercise of slight diligence it could have ascertained that he was dishonest and unfit for his position, it would have been the duty of the bank to have taken such action as would have protected the deposit from danger of theft. If any indications of his dishonesty which ought to have aroused suspicion and investigation, came to its knowledge, and it disregarded them and was guilty of gross negligence in so disregarding. them, it would be liable. If on the other · hand no such indications came to its knowledge, and it exercised the slight diligence which alone it was bound to exercise, it would not be liable.

Whatever was notice enough to excite attention and put the bank on its guard and call for inquiry, was also

notice of everything to a knowledge of which it is afterwards found that such inquiry, in the exercise of slight diligence, might have led, although all was unknown for want of investigation; that is, where it had sufficient information to so lead it to the knowledge of Gadsden's dishonesty and unfitness, it would be deemed to be cognizant of it. If it was negligent—grossly negligent in being ignorant under such circumstances, this would be equivalent to actual knowledge on its part. If at a time when the president, Hammond, was in the bank and engaged in its business, it came to his knowledge that the cashier, Gadsden, was engaged or about to engage in speculating in stocks, his knowledge would be the knowledge of the bank as to such fact. If the bank had no knowledge or notice of it, the fact that Gadsden was a speculator, if that be a fact, could not figure in this case to make the bank liable. It would be for the jury to determine whether or not the matter of speculating in stocks on the part of a bank cashier was a thing which rendered him or tended to render him an unfit and untrustworthy person to fill such a position, and whether, if knowledge of any such fact came to the bank, it would be such an indication of dishonesty or untrustworthiness as in the exercise of slight diligence would call for action on the part of the bank to protect the plaintiff's deposit; and it would be for the jury to say, under such circumstances, what action the bank ought to take, and whether or not the bank did take such action.

The purchase or sale of stock by the cashier of a bank would not of itself be proof of dishonesty, while the buying and selling of stock beyond his evident means might be. This is entirely a matter for the jury. It is for them to determine whether or not speculation on his part is such a circumstance as would render him unfit to hold his position as cashier. If the cashier had been

a speculator for a long time previous to the loss of this property, and the president of the bank knew that he was a speculator, or knew of such circumstances in regard to him as would have put any man in the exercise of slight diligence on inquiry as to the transactions of the cashier; and if such inquiry would have developed that he was a speculator, and no such inquiry was made, and by reason of the failure to make such inquiry he was left in charge of the plaintiff's property with the opportunity to steal it, and did steal it, the jury could consider all these facts in arriving at a conclusion as to whether or not the defendant was guilty of gross negligence and liable for the plaintiff's property.   Notice to the president of a bank concerning the untrustworthiness of the cashier of the bank is notice to the bank, unless the president is an accomplice of the cashier.   When the bank does its full duty in selecting a proper person and in not disregarding indications of dishonesty which ought to arouse suspicion and investigation, it is not responsible to one who has obtained from it the favor of barely keeping specific property without recompense, though the cashier steal the property so put in his charge.

There was no undertaking on the part of the bank to the plaintiff that an officer of the bank should not steal, the case does not rest on any such warranty or undertaking, but on gross negligence in care-taking. Nothing short of a knowledge of the true character of Gadsden before he stole the plaintiff's bonds, or reasonable grounds to suspect his integrity, followed by neglect to remove him, would amount to gross negligence.

If the plaintiff knew from his own personal experience that as to securities received, such as the bonds here sued for were, the directors of the bank neither examined nor looked to their custody, but that they were left entirely in the charge and control of the cashier, and that the only guarantee to parties leaving bonds under such

circumstances was the integrity and fidelity of the cashier, and if with this knowledge he left the bonds with the cashier, who afterwards stole them without gross negligence on the part of any of the other officers of the bank, he could not recover from the bank for such loss. If the plaintiff was a director of the bank for several years, and during that time made special deposits of bonds or other property, and intrusted them solely to the cashier, Gadsden, and never had them examined by the board of directors or other officer of the bank, and if the same course was pursued by the bank with reference to the bonds sued for by the plaintiff, and there were no facts known to the directors of the bank or to its officers, other than Gadsden, which would have put a man of common sense on notice that Gadsden was an improper man to be retained as cashier, then, if the bonds were stolen, the plaintiff could not require of the bank any greater degree of care in the supervision of his property by the directors than he himself exercised while he was a director.

In giving this abstract from the charge, of course much of the language, especially as to formal matters, is omitted.          *Judgment affirmed.*