## CITIZENS' GUARANTY STATE BANK et al. v. COLLINS. (No. 1860.)

Court of Civil Appeals of Texas. Beaumont.
June 6, 1929.

John S. Redditt, of Lufkin, and John W. Goodwin, of Austin, for appellants.

C. B. Collins, Simpson, Collins & Moore, and Leo Brewster, all of Fort Worth, for appellee.

WALKER, J. This suit was by appellee against appellants for damages for wrongful conversion of 10 shares of capital stock of the Collwood Lumber Company, of the par value of $1,000. Judgment was for appellee for the amount sued for. Appellant Citizens' Guaranty State Bank was closed, and placed in the hands of the banking commissioner for liquidation, on the 10th day of January, 1924. The suit was against both the bank and the banking commissioner.

Appellants' first proposition is that appellee's petition was subject to general demurrer, because there was no allegation of the reasonable value or the market value of the stock at the time of the alleged conversion, or at the time of the discovery of the alleged conversion, or at the time of the institution of this suit. The allegations of the petition on this issue were as follows:

"That some time prior to the closing of said bank the plaintiff herein had on deposit with said bank, or had left in said bank for safekeeping, a stock certificate for the amount of one thousand ($1,000.00) dollars and of the reasonable cash value of one thousand ($1,000.00) dollars, evidencing one thousand ($1,000.00) dollars worth of stock in the Collwood Lumber Company, a corporation; that, shortly prior to the closing of said bank, said bank unlawfully and without authority from the plaintiff converted said stock to its own use and benefit, to plaintiff's damage in the sum of one thousand ($1,000.00) dollars, and this plaintiff is entitled to recover said sum from the defendants herein."

While somewhat ambiguous, the petition was not attacked by special exception calling for a more specific allegation as to value. Appellee alleged that his stock was of the reasonable cash value of $1,000; that the stock was converted "shortly prior to the closing of said bank"; that plaintiff's damage was $1,000; and that he was entitled to recover that sum. We think, giving the petition the benefit of all reasonable intendments, appellee pleaded the value of his stock as of the date of conversion. Gulf Refining Co. v. Bonin (Tex. Civ. App.) 242 S. W. 776.

Appellants' remaining propositions are to the effect that the judgment against them for conversion is without support, since the evidence was to the effect, with no evidence to the contrary, that the stock was converted by G. W. Thompson to his own use and benefit, and that Thompson was an officer of the bank, and that the conversion was not for the benefit of the bank, and that there was no evidence of negligence on the part of the bank in employing Thompson or retaining him in the bank's employment. On this issue appellee testified:

"The transaction is not very difficult. Some time prior to the closing of the Citizens' Guaranty State Bank of Lufkin, Texas, I owed the bank a considerable sum of money, and I deposited with the bank as security quite a lot of collateral, among which was $1,000 of stock in the Collwood Lumber Company, a corporation. This indebtedness continued for a number of months, maybe over a year, or maybe two or three or four years. I do not remember the length of time, definitely. But when I deposited the stock as collateral it had a blank space on the back of it for indorsement of the owner of the stock to transfer it to any one he might desire to transfer it to. When I put the stock up as collateral, I signed my name in blank at the foot of that instrument, which is usual and customary in depositing collateral with banks, so that the stock could be filled out in the name of the bank or any individual, as you have your signature there. I signed this stock, leaving it in blank as security for my indebtedness in the bank, and all that was required would be to insert the names of the

banks or any one for it to become negotiable, if it became necessary to negotiate or transfer it; and later I retired this entire indebtedness, thus paying it in full—paid the bank all I owed it, and all of the obligations for which this stock was pledged as collateral.. But having confidence in the bank, and personnel and officers of the bank, I left it there, without taking it back. I did not call for it, and it never was delivered. And later Mr. G. R. Thompson, who was active vice president of the bank, took this stock and confiscated and appropriated it as for his own use and benefit, and paid for $50,000 worth of life insurance with it, filling in the name and date it occurred, and was acting in behalf of the bank, as vice president of the bank. I did not learn of this until a short time before the bank closed. I owned that stock at the time, and it represented $1,000 I had put in that company. At the time he sold this stock, or the time it was sold, it was reasonably worth the reasonable cash market value of $1,-000. * * *

"I want to state now that I did not know that the stock had been appropriated by the bank, or converted, until shortly before it closed. I presumed it was there on file. I did not know that the stock had been converted by the bank, or its officers, until shortly before the bank closed; but on investigation I found where it had been converted, or when the transfer took place. That was a year or two—perhaps it might have been probably a year before I discovered it; it might have been longer; I do not remember the date. The stock was there with the bank for a long time. I did not keep up with that date, but I did investigate that; I investigated to determine what the stock was worth at the time; I investigated specifically to determine what it was worth at the time it was converted, and I testify that it was worth 100 cents on the dollar.

"I left that stock with the bank some time in 1920. It was attached as collateral to the note. It was a personal note. As to whether I know how much the amount of the note, I will state that really the stock was left there for the use and benefit of the bank, when they had $109,000 overdraft, and I loaned them all the securities I had to cover up that overdraft. As to whether I placed it there as security for any note that I had, I will state that I left it there for security for them to use and borrow money—for the bank to use as collateral, and I had borrowed money for the bank. As to whether it was not attached to any note, I will state that it was there with the notes; I don't know whether it would be—some are attached—that is what it was to be used for. I know when those notes were paid out of the bank; they were paid off in 1921, and I did not get my stock, but just left it there in the bank. It never did occur to me to get it."

E. P. Littlejohn testified that he bought the stock from Mr. Thompson in 1921. In support of their propositions appellants say:

"The law, as we understand it, is that when an officer or employee of a bank converts bonds or stocks left with it for safekeeping to his own use such conversion is not the act of the bank unless it was negligent in employing or keeping in its employ such official or person. The evidence in this case shows that Thompson was a man that everybody had confidence in. Such being the case, the bank was not guilty of negligence in employing him, and consequently not liable for his appropriation of the stock. Under such circumsances, his act in appropriating the stock was not the act of the bank, and not chargeable to it."

Supporting this argument, appellants quote as follows from volume 1, p. 790, § 114, Banks and Banking (Michie):

"For a special deposit, received by a bank through its cashier for gratuitous safe-keeping and return to the depositor on demand, the bank is not liable if the cashier, without its knowledge or consent, steals it or fraudulently appropriates it to his own use, provided the bank has exercised due diligence in selecting the cashier and in not keeping him in office after it knew, or ought to have known, that he was or had become untrustworthy. In stealing or clandestinely appropriating the deposit to his own use, the cashier would not be acting in the bank's business, or within the scope of his employment; he would be representing himself and not the bank. There is no undertaking on the part of the bank to the bailor that an officer of the bank should not steal; the case does not rest on any such warranty or undertaking but on gross negligence in care taking."

As supporting the text cited by them, they cite Smith v. Bank, 99 Mass. 605, 97 Am. Dec. 59; Scott v. Bank, 72 Pa. 471, 13 Am. Rep. 711; Smith v. Banking Co., 69 N. J. Law, 288, 55 A. 248; Merchants' Nat. Bank v. Guilmartin, 93 Ga. 503, 21 S. E. 55, 44 Am. St. Rep. 182; and Preston v. Prather, 137 U. S. 604, 11 S. Ct. 162, 34 L. Ed. 788.

The facts of this case do not bring it within the rule contended for by appellants and supported by their authorities. This stock was not left with the bank "for gratuitous safe-keeping and return to the defendant on demand." The bank secured possession of the stock in the ordinary course of its business as collateral for a note owed it by appellee, and appellee further agreed that the bank might use this stock as collateral for its own debt, which the bank did. That was in 1920. It is not shown when appellee's debt was paid to the bank, nor when the bank's debt was paid off and appellee's collateral released. But appellee, believing his stock was in safe-keeping, never called for it, and it was never turned back to him. The stock

132

was in the bank's possession under the original contract, and was converted by its vice president, without the bank ever notifying appellee that the stock had been released to him, or that it was holding it on the basis of "gratuitous safe-keeping." Appellants say the point involved in their propositions has never been decided by the Supreme Court of this state, and ask us to be ruled by the authorities cited by them. Since the facts are not in point on their propositions, the authorities cited, of course, could not control, even in the jurisdictions wherein they were announced. Therefore the law of appellants' propositions is not before us, and we decline to express an opinion on their abstract merits.

On appellee's testimony, we think appellants were clearly liable for the conversion. This conclusion is supported by City Nat. Bank of Ft. Worth v. Martin, 70 Tex. 643, 8 S. W. 507, 8 Am. St. Rep. 632; Hall, Commissioner of Insurance and Banking, v. Conaway (Tex. Civ. App.) 252 S. W. 1105.

Affirmed.